Ben W. Muse
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: ben_muse@fd.org

*Counsel for Defendant William Corneilus J. Steadman*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM CORNEILUS J. STEADMAN,<br><br>Defendant. | Case No. 1:24-cr-00009-TMB-MMS |

**SENTENCING MEMORANDUM**

William Steadman is an incredibly complex, damaged human being who committed an unspeakable act at his nadir. As a child, he was the victim of horrific abuse. As an adult, he committed similar abuse. Nothing in this memorandum seeks to excuse Mr. Steadman's behavior. Mr. Steadman has accepted responsibility and expects a sentence commensurate with his actions. Yet, there is hope for Mr. Steadman. His criminal history is not significant and stems from a period when his struggles with substance abuse and mental health were so severe that he had lost interest in living. Since he has been incarcerated, he has found sobriety and become reinvigorated by his Christian faith. He is deeply remorseful for what he did and is firmly committed to addressing the issues that contributed to his actions.

For his conduct in this case, he respectfully requests that the Court impose a sentence of 240 months, followed by a lifetime term of supervised release. He requests that the Court recommend his placement in a Sex Offender Management Program at FCI Petersburg.[1]

## I.  FACTUAL BACKGROUND[2]

Mr. Steadman was neglected as a child.[3] He was raised by a single mother, who could not care for him adequately due to her struggles with substance misuse.[4] They lost their home and faced periods of housing instability.[5] He struggled in school and had an IEP.[6]

His upbringing left him vulnerable; he did not understand healthy boundaries, and, at 10 years of age, he was sexually abused by older men in his neighborhood who filmed the abuse.[7] This abuse lasted for several years and left an indelible mark on Mr. Steadman.[8]

His older sister (13 years older) introduced him to narcotics when he was a teenager.[9] He used these to dull the pain of his circumstances. As an adult, these adverse

---

[1]  There are three SOMP facilities within 500 miles of his mother's home outside Philadelphia. FCI Elkton, FCI Petersburg, and FMC Devens. He requests either FCI Elkton or FMC Devens if FCI Petersburg is not feasible.

[2]  Dr. Charles Samenow reviewed case materials, interviewed Mr. Steadman for approximately 5 hours, and also reviewed Mr. Steadman's behavioral health records. His report, which provides a broader factual background, is submitted at Exh. D-1, filed separately, under seal.

[3]  Dkt. 55 at ¶ 53.

[4]  Dkt. 55 at ¶ 53.

[5]  Exh. D-1 at 4.

[6]  Exh. D-1.

[7]  Dkt. 55 at ¶ 57.

[8]  Exh. D-1 4-5.

[9]  Dkt. 55 at ¶ 54.

childhood experiences have haunted him. He has struggled with methamphetamine abuse, depression, ADHD, gambling addiction, PTSD, and self-loathing.[10] He has considered and attempted suicide on multiple occasions.[11]

While this history provides context, it does not excuse his conduct that comes before the Court. Mr. Steadman feels disgust and great remorse for what he did in this case, how poorly he managed his impulses, how he hurt a young child who looked up to him in the same way he was hurt. He is determined to commit the time he will be in custody to trying to address his issues.

While in custody on this case, he has maintained his sobriety and become reinvolved in his Christian faith. He has participated in the TLC program[12] at Anchorage Jail and received numerous certificates for his rehabilitative efforts.[13] He has also participated in 5 hours of interviews with Dr. Charles Samenow, a forensic psychiatrist, with expertise in sexual disorders and addiction, and his Psychosexual Evaluation is attached to this memorandum. It relates his history, identifies the issues that contributed to his offense conduct, and discusses the steps that can be taken to mitigate his risk to the community in the future.[14]

---

[10]  Dkt. 55 at ¶ 63.
[11]  Dkt. 55 at ¶ 63.
[12]  The TLC program is a "faith based residential program within the prison setting that will provide a healthy, positive, and spiritually centered community learning environment, conducive to facilitating lasting positive change in the lives of our residents." See https://www.godinprison.com/copy-of-who-we-are.
[13]  Dkt. 55 at ¶¶ 79-81; Exh. D-3.
[14]  Exh. D-1.

*United States v. William Corneilus J. Steadman*
Case No. 1:24-cr-00009-TMB-MMS                                                     Page 3

## II. DISPUTED ASSERTIONS IN THE GOVERNMENT'S SENTENCING MEMORANDUM

A district court may not rely on false or unreliable information in fashioning a sentence.[15] Information at sentencing "is deemed false or unreliable if it lacks 'some minimal indicium of reliability beyond mere allegation.'"[16] The government makes several factual assertions in its sentencing memorandum that Mr. Steadman disputes, as they are not in the discovery available to the defense (though the black book is summarized briefly in a report) and are not consistent with Mr. Steadman's recollection.

- The government makes several assertions about the contents of a black book found in Mr. Steadman's hotel room.[17] This was a journal Mr. Steadman used for his sex offender treatment sessions. He does not recall writing in it what is related in the government's sentencing memorandum. The defense will review this item (which is in the government's possession) and hopefully resolve any dispute.
- The government asserts that Mr. Steadman produced 106 images and videos of CSAM with the victim in this case.[18] This number is not found in the discovery available to the defense (or at least it's not apparent) and does not accord with Mr. Steadman's recollection. The defense will attempt to reconcile this dispute with the government before sentencing.
- The government writes that Mr. Steadman: "befriended, groomed, and manipulated multiple minor boys within his orbit, reached out to minors on Snapchat, and was accused of sexually abusing a second boy in his community."[19] Mr. Steadman disputes these assertions.

//

//

---

[15]  *See United States v. Vanderwerfhorst*, 576 F.3d 929, 936 (9th Cir. 2009).
[16]  *Id.*
[17]  Dkt. 68 at 4.
[18]  Dkt. 68 at 3.
[19]  Dkt. 68 at 8.

### III.   PSR OBJECTIONS

Mr. Steadman has several outstanding objections to the PSR-writer's Guidelines calculation. It should be noted that, even excluding these perceived errors, the defense's offense level calculation is the same as that reached by the PSR-writer because of the Offense Level 43 cap. Mr. Steadman raises these issues to preserve the record and because the Court's variance analysis should start from a correctly framed offense level rather than an inflated one.

### A. Child Pornography Possession Discussed in the PSR Is Not "Relevant Conduct" Under § 1B1.3

Pursuant to § 1B1.3(a)(1)(A), to qualify as relevant conduct, the defendant's conduct must have "occurred *during* the commission of the *offense of conviction*, in *preparation* for that offense" or "in the course of *attempting to avoid detection or responsibility* for that offense." In this case, the child pornography possession was separate conduct from the offense conduct of production and cannot be said to have occurred during the offense of conviction. This view is supported in the case law.[20]

Further, this conduct is not "relevant conduct" under § 1B1.3(a)(2), that is, an "act[] or omission[]…that w[as] part of the same course of conduct or common scheme or plan as the offense of conviction." Under this provision, "relevant conduct" is limited to

---

[20]   See, e.g., *U.S. v. Randall*, 924 F.3d 790, 797(5th Cir. 2019)(no evidence that defendant used the image of the victim in the charged count to obtain other images from other victims); *U.S. v. Wernick*, 691 F.3d 108 (2d Cir. 2012)(reversing because defendant's conduct with young children did not "occur [] during the commission of" or "in preparation for" the crimes against the teenagers).

"offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." Sections 2G2.1 and 3D1.2(d) expressly *exclude* § 2G2.1 production offenses from § 3D1.2(d) grouping.

### B. §2G2.1(b)(4)(A) and USSG §2G2.2(b)(7)(D) Do Not Apply Because They Relate to Conduct Pertaining to Uncharged Child Pornography Possession (Which Is Not "Relevant Conduct")

When a defendant has been convicted of both possession of child pornography and production of child pornography, the counts should be grouped separately, and an enhancement for one count should not be applied to the other count.[21] While Mr. Steadman has not been convicted of child pornography possession, he has admitted to this conduct, and the logic applies with the same force. The PSR writer errs in applying two enhancements to the production count of conviction for specific offense characteristics related to the uncharged child pornography possession conduct.

In this case, the PSR writer, in ¶ 29, has applied an enhancement under §2G2.1(b)(4)(A) because the "defendant was in possession of a CSAM video that depicted a toddler being abused by an adult male."[22] Notably, while Mr. Steadman had this video on one of his devices, he did not produce this material. In *United States v. Dickson*, the 5th Circuit, under factually similar circumstances, found that "it was error to increase production count for sadistic material that applied only to the possession count."[23]

---

[21] *See, e.g.*, *United States v. Dickson*, 632 F.3d 186, 191 (5th Cir. 2011) (it was an error to increase production count for sadistic material that applied only to the possession count).
[22] Dkt. 55 at ¶ 9.
[23] *Dickson*, 632 F.3d at 191.

The same analysis applies to the enhancement under USSG §2G2.2(b)(7)(D). Notably, this is a completely separate Guideline from the production Guideline. It's not clear what mechanism the PSR writer is employing to impose this specific offense characteristic from a separate Guideline. It states:

> Pursuant to USSG §1B1.1, comment. (4)(B), Cumulative Application of Multiple Adjustments from Multiple Guidelines, absent an instruction to the contrary, enhancements under Chapter Two, adjustments under Chapter Three, and determinations under Chapter Four are to be applied cumulatively.[24]

But this does not explain why specific offense characteristics can be imposed from multiple Chapter Two Guidelines without a cross-reference. The PSR writer appears to have erroneously applied the guidance of U.S.S.G. §1B1.

## IV. GUIDELINE CALCULATION

| Applicable Guideline Provision | PSR-Writer's Guideline Calculation | Mr. Steadman's Guideline Calculation |
|---|---|---|
| Base Offense (§ 2G2.1(a)(1) | 32 | 32 |
| Minor Not 12 Years of Age (§ USSG 2G2.1(b)(1)(A). | +4 | +4 |
| Offense Involved Sexual Act or Sexual Contact USSG §2G2.1(b)(2)(A) | +2 | +2 |
| Distribution USSG §2G2.1(b)(3). Sadomasochistic Imagery USSG §2G2.1(b)(4)(A) | +2 | +2 |

---

[24] Dkt. 55 at 38.

*United States v. William Corneilus J. Steadman*
Case No. 1:24-cr-00009-TMB-MMS                                                          Page 7

|  |  |  |
|---|---|---|
|  | +4 | 0 |
| Supervisory Control USSG §2G2.1(b)(5). | +2 | +2 |
| 600 Images USSG §2G2.2(b)(7)(D) | +5 | 0 |
| Pattern USSG §4B1.5(b)(1). | +5 | +5 |
| Acceptance (§3E1.1(b)) | -3 | -3 |
| Total Offense Level | 43 | 43 |
| Guidelines[25] | Life | Life |
| JSIN Data (§2G1.3)[26] (mean, median) | 355,360 months | 355,360 months |

## V. AN APPLICATION OF THE § 3553(a) FACTORS SUPPORTS THE IMPOSITION OF A 240 MONTH SENTENCE

The Sentencing Guidelines provide:

After determining the kinds of sentence and guidelines range pursuant to subsection (a) of §1B1.1 (Application Instructions) and 18 U.S.C. § 3553(a)(4) and (5), the court shall consider the other applicable factors in 18 U.S.C. § 3553(a) to determine

---

[25] Assuming Criminal History Category II.
[26] United States Sentencing Commission, *Judiciary Sentencing INformation*, available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited December 2, 2025).

*United States v. William Corneilus J. Steadman*
Case No. 1:24-cr-00009-TMB-MMS                                                      Page 8

a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.[27]

Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable."[28] Instead, the Court "must make an individualized assessment based on the facts" of each case, recognizing that a within-guidelines sentence may be greater than necessary to serve the purposes of sentencing.[29] In making this assessment, a court should consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to meet the purposes of sentencing listed in 3553(a)(2);[30] (3) the kinds of sentences available; (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; (5) the need to provide restitution to any victims of the offense.[31]

If the Court conducts this analysis and opts to vary from the Guidelines, "the amount by which a sentence deviates from the applicable Guidelines range is not a measure of how

---

[27] U.S.S.G. §1B1.1.
[28] *Gall v. United States*, 552 U.S. 38, 50 (2007).
[29] *Id.*; *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *see United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.").
[30] "[T]o reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).
[31] 18 U.S.C. § 3553(a); U.S.S.G §1B1.1.

'reasonable' a sentence is."[32]  Rather, "reasonableness is determined instead by the district court's individualized application of the statutory sentencing factors."[33]

In conducting this individualized assessment, a court may vary from the Guidelines promulgated by the sentencing commission if it finds that the Guidelines are not the result of the Sentencing Commission's empirical analysis and institutional expertise.[34] This principle has been explicitly extended to the child pornography Guidelines, including §2G2.2, which are "not the result of the Commission's 'exercise of its characteristic institutional role,' which requires that it base its determinations on 'empirical data and national experience,' but of frequent mandatory minimum legislation and specific congressional directives to the Commission to amend the Guidelines."[35]

This memorandum will examine the sentencing factors relevant to this case.

## A. The Nature and Circumstances of the Offense Support a 240 Month Sentence

Undoubtedly, this case involves serious, gut-wrenching conduct that cannot be excused. Fortunately, it appears the conduct occurred over a short period of time, and few images were generated[36] (and it appears Mr. Steadman may have deleted them from the

---

[32] *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47).
[33] *Id.*
[34] *Kimbrough v. United States*, 552 U.S. 85 (2007); *see United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010) ("As the Supreme Court through Booker, Kimbrough, and Spears has instructed, and as other circuits that have confronted the crack/powder variance in the sentence of a career offender have accepted and clarified in their circuit law, sentencing judges can reject any Sentencing Guideline, provided that the sentence imposed is reasonable.") (emphasis in original).
[35] *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011).
[36] The government asserts that "43 images and 63 videos of child sexual abuse material" were

Dark web), no physical violence was employed, and there was only one victim.[37] Though he invoked his right to counsel during his police interview, he signed a consent form to allow investigators to search his phone.

Mr. Steadman understands the wrongfulness of his conduct and has taken responsibility for his actions in a sincere effort not to make the person he hurt subject to protracted proceedings. While below the Guidelines, a sentence of 240 months is a serious, life-altering sentence, and is proportionate to Mr. Steadman's conduct.

### B. Mr. Steadman's Personal Characteristics Support a Sentence of 240 Months

Mr. Steadman was abused and neglected as a child, and this history, sadly, influenced his conduct in this case. It likely contributed significantly to his mental health issues and substance misuse.[38]  He did not choose this past, and it is certainly fair to consider him less culpable than someone guilty of similar conduct without this history.[39]

But as tragic as Mr. Steadman's past is, it does not absolve him of agency or make him blameless. He chose to perpetuate the cycle of abuse in this case. The ultimate question

---

produced with the victim in this case. Dkt. 68 at 3. That does not accord with the discovery provided to the defense, which references only 4 images of CSAM featuring the victim.

[37]  The government asserts that Steadman "befriended, groomed, and manipulated minor boys within his orbit, reached out to minors on Snapchat, and was accused of sexually abusing a second boy in his community." Dkt. 68 at 8. This assertion is not substantiated by the discovery available to the defense. It's not clear what specific conduct the government is referring to.

[38]  Exh. D-1 at 11.

[39]  *See United States v. Janosko*, 355 Fed. Appx. 892, 894 (6th Cir. 2009) (treating defendant's sexual abuse as a child as a mitigating factor when sentencing child pornography offender); *United States v. Prisel*, 316 Fed. Appx. 377, 382 (6th Cir. 2008) (same); *United States v. Pelloski*, 31 F. Supp. 3d 952, 961-62 (S.D. Ohio 2014); *United States v. Grober*, 595 F. Supp. 2d 382, 410 (D.N.J. 2008) (same); *United States v. Hanson*, 561 F. Supp. 2d 1004, 1007 (E.D. Wis. 2008) (same).

for the Court is whether, following a significant period of incarceration, Mr. Steadman can be safely reintegrated into the community.

As Dr. Samenow notes, Mr. Steadman's "offending behavior was facilitated by unresolved trauma, unaddressed mental health issues, his undifferentiated sexual orientation and his ease of access to the victim."[40]  He explains:

> Mr. Steadman experienced significant sexual trauma and pornography exposure at an early age. This trauma, coupled with his disorganized and chaotic family upbringing, has led him to develop several mental health conditions, including PTSD and depression.  These have manifested in intrusive negative thoughts, behavioral acting out, suicide attempts, and a variety of other negative emotions.  To cope with this, Mr. Steadman maladaptively relied on alcohol, drugs, sex/pornography, and gambling.  Concurrent to this, Mr. Steadman had unresolved sexual orientation issues. It is likely the combination of lack of judgment and hypersexuality from substance use, coupled with Mr. Steadman's mental health condition and undifferentiated sexual orientation, led him to have pedophilic sexual interests that became reinforced through accessing CSAM on the internet.  Unfortunately, since many of Mr. Steadman's mental health conditions remained unaddressed (some by his own choices/behavior), he not only relapsed on CSAM consumption but, due to his proximity with a minor victim with whom he shared emotional congruence, he tragically progressed to a hands-on offense.[41]

Many of the issues that facilitated Mr. Steadman's behavior can be addressed. His risk is not static. As Dr. Samenow notes, "[t]he research on sexual recidivism strongly indicates that risk can change based on life circumstances, life choices, aging, or deliberate interventions - such as participating in treatment (Hanson et, al, 2017), and probation/supervised release."[42] For instance, Mr. Steadman abused methamphetamine—

---

[40]  Exh. D-1 at 12.
[41]  Exh. D-1 at 13
[42]  Exh. D-1 at 13.

this behavior can be modified through treatment in the BOP and monitoring in the community. Mr. Steadman's struggles with depression and PTSD can be similarly addressed.

More significantly, Steadman will be much older after a 240-month sentence, and the ageing process will also reduce his risk of recidivism. This is clearly borne out by the data, which shows individuals de-escalating their behavior in middle age.[43] Dr. Samenow writes:

> When interventions are combined with the aging process, the risk [of recidivism] is significantly reduced year over year (LeBlanc, 2020). Due to brain maturation, older individuals may be more receptive to such interventions than younger adults. In other words, while individuals can engage in criminal behavior at any age, once caught, punished, and rehabilitated, older individuals tend to respond better to intervention than their younger counterparts.[44]

Mr. Steadman's possible pedophilic disorder is of concern, as Dr. Samenow opines that it motivated his actions.[45] Several points are worth considering on that issue. First, as Dr. Samenow notes, Mr. Steadman's sexual desire/hypersexuality will necessarily decline with age.[46] In addition, mental health treatment and substance misuse treatment will assist

---

[43] As widely noted, "research shows that after peaking in the mid-to-late teenage years, offending begins to decline as individuals are in their 20s and drops sharply as they reach their 30s and 40s." Marc Mauer, "A Proposal to Reduce Time Served in Federal Prison," Testimony to Charles Colson Task Force on Federal Corrections, 27 Fed. Sent. R. 300, 301, 2015 WL 4199237 (June 1, 2015); *see also* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders,* at 3 (2017) ("Older offenders were substantially less likely than younger offenders to recidivate following release .... The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased.").

[44] Exh. D-1 at 13.

[45] Exh. D-1 at 8.

[46] Exh. D-1 at 13.

him in curbing his impulses. And, within the BOP and on supervised release, he will have sex offender treatment, which will also mitigate his risk. Finally, as Dr. Samenow notes, Mr. Steadman "has a history of sexual relationships with age-appropriate women and sexual arousal to adult sexual material" and the presence of this history is grounds for optimism as to Mr. Steadman's potential for rehabilitation as "[t]he research literature has demonstrated that the absence of adult sexual interest is far more predictive of recidivism than pedophilic interests (Schippers et. al., 2023)."[47]

Other protective factors suggest Mr. Steadman's rehabilitative potential. Mr. Steadman has a continuous work history, which shows that he can handle responsibility.[48] As the support letters indicate, he has a network of friends who will help him as he navigates the world post-incarceration.[49]

His criminal history is not extensive[50] and is mostly (outside a reckless driving conviction) limited to a seven-year period between 2017 and 2024, when he was in the

---

[47]  Exh. D-1 at 15.

[48]  *See, e.g.*, *United States v. Big Crow*, 898 F.2d 1326, 1331-32 (8th Cir. 1990) (upholding downward variance for a twenty-three-year-old in an assault case because of an excellent employment record); *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008)(affirming sentence of one year and one day for defendant convicted of possession with intent to distribute heroin, despite guideline range of 46-57 months, in part because of defendant's "long and consistent work history.").

[49]  Exh. D-2.

[50]  The government states that at the "young age of 35, Steadman has an extensive criminal history, demonstrating his propensity to violate the law." Dkt. 68 at 11.  Thirty-five is middle-aged, and Steadman does not, in fact, have an extensive criminal history, particularly for a middle-aged man. He has his CSAM possession conviction from 2017 and reckless driving conviction from 2009, when he was 19, for 3 countable criminal history points. The government brings up other allegations, which Mr. Steadman contests.

depths of his addiction and mental health struggles. [51]  This also suggests he has rehabilitative potential.

In sum, given his specific history, 240 months is a sufficient period of isolation to give Mr. Steadman the opportunity to address his issues in a secure fashion before reintegrating into the community.

### C.  A 240 Month Sentence Achieves Deterrence

There is a great deal of empirical research illustrating the counterintuitive proposition that lengthier sentences of incarceration are, generally, an ineffective deterrent.[52] Potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the way an ideal rational decision-maker hypothetically would.[53] Even the Sentencing Commission recognizes this fact: "There is no correlation between recidivism and the Guidelines' offense level. Whether an offender has a low or high Guideline offense level, recidivism rates are similar."[54]

---

[51]  Dkt. 55 at ¶ ¶ 42-43.

[52]  *See, e.g.*, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006); Charles Loeffler et al., *The Impact of Incarceration on Recidivism*, 5 Annual Review of Criminology 133 (2022), available at https://www.annualreviews.org/doi/full/10.1146/annurev-criminol-030920-112506  (last visited April 26, 2023)("Most studies we review, in fact, find that the experience of postconviction imprisonment has little impact on the probability of recidivism.").

[53]  *See Id.*; Gary Kleck et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005) ("There is generally no significant association between perceptions of punishment levels and actual levels…implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms.").

[54]  *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004).

While Mr. Steadman's criminal history is serious, it is not extensive, especially given his age (35). His longest period of consecutive incarceration appears to have been about 2 years.[55] A sentence of 240 months is a significant amplification and more than necessary to achieve specific deterrence.[56]

## D. The Recommended Sentence Does Not Create a Disparity

Courts have recognized that it is appropriate to consider sentencing commission data as a "starting point" in a disparity analysis.[57] In FY 2024, while the average sentence for criminal sexual abuse was 229 months, the average sentence for production of child pornography was 273 months, and 305 months for those facing a mandatory minimum.[58] 48% of those sentenced for sexual abuse or production received a downward variance, with the average sentence reduction being 31%.[59] This roughly tracks with the JSIN data, taking into account the specific offense characteristics found in Mr. Steadman's case, which indicates that the average sentence for production to those similarly situated to Mr.

---

[55] Dkt. 55 at ¶¶ 42-43.

[56] *See United States v. Qualls*, 373 F. Supp. 2d 873 (E.D. Wis. 2005) ("It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

[57] *United States v. Martin*, No. 24-5829, 2025 LX 210628, at *7-8 (6th Cir. July 3, 2025) (citing *United States v. Hymes*, 19 F.4th 928, 935 (6th Cir. 2021) (quoting *United States v. Stock*, 685 F.3d 621, 629 n.6 (6th Cir. 2012))

[58] United States Sentencing Commission, *Quick Facts: Sexual Abuse Sentences* (2024) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Sexual_Abuse_FY24.pdf).

[59] *Id.*

Steadman—CHC II, OL 43—was 355 months from FY 2020-2024.[60]  Notably, the JSIN average skews higher as it omits some data, to include 4% of defendants who received a §5K1.1 substantial assistance departure.[61]  It's also worth noting that none of these statistics differentiate between offenders who have been convicted after trial and those who have accepted responsibility and pleaded guilty—like Mr. Steadman—with no effect on his maximum Base Offense Level of 43.

The government cites *Aguirre(*who possessed and distributed child pornography and had a sexual relationship with his high school student*)[62]* and *Atherton* (who sexually assaulted a toddler and produced child pornography)*[63]* as comparators; in each case, the defendant received 360 months, the maximum sentence, though their Guidelines were life.[64]  These cases reaffirm the JSIN data.

*Millican* was a sextortion case, where the defendant coerced at least 10 teenage girls into sending him nude photos, causing them deep psychological stress and suicidal ideation.[65] He also unsuccessfully tried to meet up with a minor victim.[66] He did not take

---

[60]  United States Sentencing Commission, *Judiciary Sentencing INformation*, available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited December 2, 2025).

[61]  *Id.*

[62]  *United States v. Aguirre*, 448 F. App'x 670, 672 (9th Cir. 2011).

[63]  *United States v. Atherton*, 106 F.4th 888, 901 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, 134 F.4th 1009 (9th Cir. 2025).

[64]  Dkt. 68 at 17-18.

[65]  UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Christopher MILLICAN, Defendant-Appellant., 2023 WL 8850781, at *56.

[66]  *Id.* at *58

responsibility for his actions and was convicted after trial.[67] The government neglects to mention that Millican was sentenced on multiple counts for discrete conduct; his sentence was a combined 570 months—360 months on the production count and 210 months on a separate count of receipt.[68] Again, this case reaffirms the JSIN data.

In this case, a sentence of 240 months aligns with the average sentence received for the production of child pornography and is justified by Mr. Steadman's history and characteristics. No disparity is created by such a sentence.

## VI. BOP DESIGNATION

The BOP recognizes sex offenders as a vulnerable population within a prison setting. "Institutional assignment, unit management, Psychology Treatment Programs, and re-entry planning promote the well-being of sex offenders while incarcerated and help both the offenders and society by reducing the likelihood of re-offence after release."[69] Sex Offender Management Programs (SOMP) are provided at designated institutions and include both residential and non-residential treatment. This treatment "involves high intensity programming" where participants "learn basic skills and concepts to help them understand their past offenses [and] benefit from a therapeutic community . . . where they work to reduce their risk of future offending."[70] Mr. Steadman

---

[67]   *Id.* at *50.
[68]   *Id.*
[69]   Federal Bureau of Prisons, Custody & Care, Sex Offenders, *available at* https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp.
[70]   *Id.*

*United States v. William Corneilus J. Steadman*
Case No. 1:24-cr-00009-TMB-MMS                                                          Page 18

requests that the Court recommend his designation to a SOMP institution "to provide . . . correctional treatment in the most effective manner."[71] Mr. Steadman's mother is living in Pennsylvania. Accordingly, he requests a recommendation for placement at FCI Petersburg, which is located in Virginia about 300 miles from Philadelphia where his mother lives.

## VII. CONCLUSION

Mr. Steadman victimized a child. Nothing in this memorandum attempts to minimize that, and neither does he. It was truly a sickening conduct. But Mr. Steadman is not a monster but an extremely damaged person who carried the wound of his own sexual abuse unaddressed into adulthood, and who — in the depths of addiction, depression, and untreated trauma — inflicted on a child the same harm once inflicted on him. Again, that history does not excuse his conduct. It merely provides context, and it identifies precisely what must be treated for him to one day return safely to the community: trauma, mental illness, and addiction, each of which is responsive to the interventions available in the BOP and on supervised release.

It should be emphasized that a sentence of 240 months is not lenient. It is roughly ten times longer than any sentence Mr. Steadman has ever served — and he will not leave prison until his mid-fifties, an age at which the empirical data show the risk of re-offense has declined sharply. It tracks the national average sentence for production offenses,

---

[71]  18 U.S.C. § 3553(a)(2)(D).

*United States v. William Corneilus J. Steadman*
Case No. 1:24-cr-00009-TMB-MMS                                                    Page 19

credits his early acceptance of responsibility, which spared his victim protracted proceedings, and will be followed by a lifetime of supervised release with sex offender treatment and close monitoring. It is, in the language of § 3553(a), sufficient but not greater than necessary to punish this offense, protect the public, and provide Mr. Steadman the treatment he needs.

Mr. Steadman, therefore, respectfully requests that the Court impose a sentence of 240 months' imprisonment followed by a lifetime term of supervised release, and recommend his designation to FCI Petersburg so that he may participate in the Sex Offender Management Program near his family.

DATED this 10th day of June, 2026.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Ben W. Muse*
Ben W. Muse
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on June 10, 2026. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Ben W. Muse*